UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HARMONIC, INC. SECURITIES LITIGATION<br>_____<br>This Document Relates to:<br><br>   ALL ACTIONS.<br><br>_____/ | No. C-00-2287 PJH (EMC)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ANSWERS TO INTERROGATORIES REGARDING "CONFIDENTIAL WITNESSES"**<br><br>**(Docket No. 237)** |

On June 27, 2007, Defendants filed a motion to compel answers to interrogatories regarding five "confidential witnesses" ("CWs"). Plaintiffs made specific reference to the CWs and cited information they provided to support the 1934 Securities Exchange Act claims, which were asserted in Plaintiffs' second amended complaint ("SAC"). Although the 1934 Act claims were eventually dismissed and Plaintiffs later filed a third amended complaint ("TAC") which no longer made specific reference to the CWs, the information provided by the CWs was still used to support the 1933 Securities Act claims in the TAC. Plaintiffs claim that the witnesses' identities are protected by the work product privilege.

Having reviewed the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion to compel.

## I.  FACTUAL & PROCEDURAL BACKGROUND

Harmonic, Inc. is a Silicon Valley-based cable equipment supplier. *See* TAC ¶ 24. In October 1999, Harmonic and C-Cube Microsystems, Inc. announced that Harmonic would acquire

1  C-Cube's DiviCom division, conditioned on shareholder approval by both Harmonic and C-Cube
2  shareholders.  In March 2000, Harmonic and C-Cube filed a Form S-4 Registration Statement with
3  the SEC, which contained the Harmonic and C-Cube joint proxy statement/prospectus.  In April
4  2000, Harmonic and C-Cube's shareholders voted to approve the merger, and the merger closed in
5  May 2000.

6        In June 2000, Harmonic announced that it did not expect to meet analysts' expectations for
7  the second quarter of 2000.  Thereafter, Plaintiffs initiated this lawsuit, alleging violations of the
8  Securities Exchange Act of 1934 as well as the Securities Act of 1933.

9        In July 2001, Judge Hamilton dismissed Plaintiffs' complaint with leave to amend.  In
10 response, Plaintiffs filed a SAC, which again alleged violations of the 1934 Act and the 1933 Act
11 and which contained a section titled "Confidential Sources."  In this section, Plaintiffs identified five
12 CWs; provided information as to their job titles while employed by Harmonic, C-Cube, or DiviCom;
13 asserted that they had personal knowledge of certain facts; and then described in detail what those
14 facts were.  *See* Rodriguez Decl., Ex. 1 (SAC).

15       Judge Hamilton dismissed the SAC with prejudice in November 2002.  Thereafter, Plaintiffs
16 appealed to the Ninth Circuit.  The Ninth Circuit affirmed the dismissal of the 1934 Act claims but
17 reversed the dismissal of the 1933 Act claims.  In May 2006, Plaintiffs filed their TAC.

18       In the TAC, Plaintiffs allege that they bring their action on behalf of those who received,
19 purchased, or otherwise acquired Harmonic stock issued pursuant to Harmonic's Form S-4
20 Registration Statement filed in March 2000, which contained the Harmonic and C-Cube joint proxy
21 statement/prospectus.  *See* TAC ¶ 2.  According to Plaintiffs, Defendants violated the 1933 Act
22 because the registration statement issued by Harmonic was misleading.  For example, the
23 registration statement highlighted Harmonic's strong business trends, in particular its increased sales
24 to AT&T in 1988 and the first three quarters of 1999, but did not disclose that, in mid-1999, AT&T
25 was actually turning away from improving and expanding its network and that Harmonic sales to
26 AT&T had actually declined from the third quarter to the fourth quarter of 1999.  *See id.* ¶¶ 7-8.
27 According to Plaintiffs, the registration statement also failed to disclose that, immediately after the
28 October 1999 announcement of the merger with Harmonic, DiviCom's sales declined precipitously

during the fourth quarter of 1999 and the first quarter of 2000 because key DiviCom customers, concerned about DiviCom's being acquired by a cable company, started canceling orders. *See id.* ¶ 11.

## II. DISCUSSION

As indicated above, Plaintiffs' SAC contained allegations based on statements made by the CWs. Plaintiffs' TAC -- while it no longer makes specific reference to the CWs – repeats the same allegations.

For example, in the SAC, Plaintiffs allege that Confidential Witness No. 1 ("CW-1"), a former high-ranking DiviCom employee, had personal knowledge that "DirecTV, Look TV, and Echo Star all 'openly expressed' serious concerns that DiviCom's acquisition by a cable company would draw the company's focus and development away from the satellite products." SAC ¶ 32(g). The TAC contains the same allegation, asserting that, "[i]mmediately upon learning of the Agreement [between Harmonic and C-Cube], Divicom's largest satellite customers . . . openly expressed serious concern that Divicom's acquisition by a cable company would draw the company's focus and development efforts away from satellite products in favor of its cable products." TAC ¶ 36. Apart from slight variations in wording, the primary difference between the factual allegation made in the SAC and that in the TAC is the lack of attribution to CW-1.

Plaintiffs repeat this practice throughout the TAC. There are several instances where alleged facts in the TAC arise out of CWs' statements in the SAC. However, these alleged facts in the TAC are no longer attributed to a CW as they were in the SAC.

Although the TAC no longer makes specific reference to the CWs, Defendants have -- not surprisingly -- sought to discover the identities of the CWs since, as demonstrated by the SAC, their statements underlie many of the allegations in the TAC. At issue here is an interrogatory which Defendants propounded on Plaintiffs. That interrogatory asks Plaintiffs to "[i]dentify each Confidential Witness mentioned in the Second Consolidated Amended Complaint . . . and state the corresponding number by which the Confidential Witness was designated." Mot. at 5. Plaintiffs refused to respond to the interrogatory on the basis of the work product privilege. Plaintiffs have maintained this position even after Defendants stated that they were willing to "accept the names of

3

the five witnesses without Plaintiffs having to link the names to the corresponding confidential witness number." *Id.*

As a preliminary matter, the Court notes that the identities of the CWs are relevant to Plaintiffs' claims. The fact that the CWs were mentioned in a complaint that has since been dismissed has no bearing on their relevance since their statements are now relied upon to support the current complaint. Plaintiffs cannot expect that merely removing attribution in the TAC will raise a protective wall around the CWs' identities. The Court therefore turns to the main issue here which is whether the work product privilege protects against the disclosure by way of an interrogatory of the identities of the confidential witnesses.

Plaintiffs' claim of protection rests on the theory that disclosing the identities of the CWs will reveal the mental impressions of counsel. The Court is not persuaded. Defendants are not seeking the preliminary notes or other memoranda written during the interviews of these witnesses, which would be considered protected work product. *See, e.g.*, *Upjohn Co. v. U.S.*, 449 U.S. 383, 399 (1980) ("Forcing an attorney to disclose notes and memoranda of witness' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."). Nor are Defendants asking for Plaintiffs to summarize the substance of those interviews in an interrogatory response. Plaintiffs have already divulged the contents of those interviews or at least substantial portions thereof by filing the SAC. What Defendants seek here is only the identities of witnesses whom Plaintiffs have deemed credible enough to rely upon in two of their complaints.

There is no binding precedent as to whether disclosure of the mere identity of a CW at this juncture is protected work product. Neither the Supreme Court nor the Ninth Circuit has opined on the matter. As to those courts that have addressed the issue, some have held that the identities are privileged; other courts have held they are not. *Compare, e.g.*, *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, No. C01-20418 JW, 2005 WL 1459555 (N.D. Cal. Jun. 21, 2005) (concluding that witnesses' identities reveal counsel's mental impressions and trial strategy and therefore work product protections apply), and *In re MTI Tech. Corp. Sec. Litig. II*, No. SACV 00-0745 DOC, 2002 WL 32344347 (C.D. Cal. Jun. 13, 2002) (concluding that the identity of witnesses contains work product content), *with Miller v. Ventro Corp.*, No. C01-01287 SBA (EDL),

4

2004 WL 868202 (N.D. Cal. Apr. 21, 2004) (concluding that disclosure of CWs' identities would not reveal attorney's mental impressions and therefore work product doctrine does not apply).

The Court finds the reasoning in *Ventro* more persuasive. The issue here, like that in *Ventro*, is not *if* the CWs' identities will ever be discovered, but rather *when* they will be discovered. *See Ventro*, 2004 WL 868202, at *2 (finding that the CWs identities would be inevitably revealed over the course of the trial process). Plaintiffs admit as much by acknowledging that the five CWs have been identified among the list of 77 witnesses in their initial disclosures. They concede that by deposing or otherwise investigating all of the 77 witnesses, Defendants will eventually be able to discern who the five CWs are. Thus, as in *Ventro*, it is a matter of when, not if, the CWs' identities will be discovered. While there are some instances in which the timing or sequencing of disclosures may affect counsel's strategy (such as the sequence and timing of expert disclosures), here there is no cognizable strategic advantage to be gained by Plaintiffs in withholding the identities. The only effect is to force the Defendants to expend resources on taking the depositions of 77 people in order to obtain the information. Because the information will inevitably be disclosed and the earlier disclosure does not compromise Plaintiffs' strategic or tactical position, there is no basis for finding work product protection. *See United States v. Nobles*, 422 U.S. 225, 238 (1975) ("At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); *Hickman v. Taylor*, 329 U.S. 495, 512 (1947) (basing work product protection on attorney's need to "prepare his legal theories and plan his strategy without undue interference"); *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("The conditional protections afforded by the work product rule prevent exploitation of party's efforts in preparing litigation."). Rather, requiring such a dilatory exercise runs counter to the "just, speedy, and inexpensive determination" directed by the Federal Rules of Civil Procedure. Fed. R. Civ. P. 1.

Plaintiffs contend that *Ventro* is distinguishable from the instant case because the TAC does not contains claims governed by the Private Securities Litigation Reform Act ("PSLRA"). Plaintiffs note that *Ventro* and other cases resulting in the disclosure of witness identities involved the PSLRA's heightened pleading requirements. *See Ventro*, 2004 WL 868202, at *1 ("To satisfy the

1  heightened pleading requirements for securities fraud litigation contained in the Private Securities
2  Litigation Reform Act of 1995, Plaintiffs relied heavily in their complaint on twenty-two
3  Confidential Witnesses (CWs). . . ."); *In re Aetna Inc. Sec. Litig.*, 1999 WL 354527, at *4 (E.D. Pa.
4  May 26, 1999) ("Furthermore, the disclosure of names and addresses of persons interviewed by
5  Plaintiffs' counsel is consistent with the policy considerations underlying the [PSLRA]."). Since the
6  current case at bar deals with claims outside the purview of the PSLRA, Plaintiffs argue that this
7  Court cannot reach the same conclusion as these prior cases.

8       That PSLRA claims no longer obtain in this suit is irrelevant. A close reading of *Aetna* and
9  *Ventro* reveals that the PSLRA's heightened pleading requirement was not essential to those courts'
10 decisions. The essence of *Ventro*, *Aetna*, and other related cases is that resources should not be
11 wasted if the relevant information sought will inevitably come to light. That fact remains whether
12 there are PSLRA claims or not in this case, the information which came from the CWs is relevant to
13 the 1933 Securities Act claims and will inevitably be disclosed.

14      The instant case is distinguishable from *Plumbers*, one of the cases upon which Plaintiffs
15 rely in support of their position. In *Plumbers*, the interrogatory at issue requested a list of "all
16 persons that [were] interviewed during the course of the investigation." *Plumbers*, 2005 WL
17 1459555, at *5. This broad request would undoubtedly provide insight into counsel's thought
18 processes during preparation for litigation. For example, one would be able to discern how counsel
19 structured the pretrial investigation as well as the entire universe of potential witness which counsel
20 believed had relevant information. In the instant case, the interrogatory propounded by Defendants
21 is not so broad and would not implicate the same threat to counsel's thought process.

22      The main concern cited by *Plumbers* and *MTI* is that legal strategy would be revealed by
23 disclosing the identities. *See Plumbers*, 2005 WL 1459555, at *4; *MTI*, 2002 WL 32344347, at *3.
24 As discussed above, the Court does not believe that such a threat is present in the instant case.
25 Plaintiffs have already revealed their legal strategy by including the CWs' statements in the SAC. It
26 is obvious that Plaintiffs considered these five CWs' knowledge important. Furthermore, Plaintiffs
27 have already provided substantial indicators as to who the CWs are. *See, e.g.*, SAC ¶ 33 (identifying
28 CW-2 as a "former high ranking employee at Harmonic working in an administrative/purchasing

6

1  capacity from prior to the Class Period through 5/00" and "responsible for maintaining Harmonic's
2  daily backlog reports"). They have indeed named them within a list of 77 witnesses.
3      Even if the CWs' identities were protected work product, disclosure would nonetheless be
4  required because, at best, the information is factual work product. The scope of that factual work
5  product is minimal here since the only information being withheld is the identities of the CWs.
6  Defendants' need for and interest in this information would overcome the *de minimis* work product
7  under the balancing process between the work product interest and the interest in discovery. *See*
8  *United States v. Amerada Hess Corp.*, 619 F.2d 980, 988 (3d Cir. 1980) (concluding that the work
9  product doctrine requires a "balancing of competing interests" and that the minimal substantive
10 content of the work product being sought was outweighed by the need to avoid time and effort); *In*
11 *re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *5 (E.D. Pa. May
12 26, 2006) (compelling responses to interrogatories in light of minimal substantive content);
13 *Computer Assocs. Int'l, Inc. v. Quest Software, Inc.*, No. 02 C 4721, 2003 WL 22159022, at *1
14 (N.D. Ill. Sep. 17, 2003) (stating that, "[w]hile it is true that defendants have an opportunity to
15 interview these employees on their own, we believe that the disclosure of the names is extremely
16 unlikely to have a prejudicial effect on [the plaintiff] or give defendants any insight into its
17 preparation for litigation [--] [i]nstead, it will serve only to expedite the gathering of relevant
18 information"); *In re Theragenics Corp. Sec. Litig.*, 205 F.R.D. 631, 636 (N.D. Ga. 2002)
19 (compelling answers to interrogatories since disclosure "will provide minimal, if any, disclosure of
20 an attorney's thought processes"). In cases involving work product of "minimal substantive
21 content," the showing of "substantial need" and "undue hardship" required by Rule 26(b)(3) is
22 "comparatively lower." *Amerada*, 619 F.2d at 988. In this case, as in *Amerada*, the minimal
23 substantive content of the witnesses' identities diminishes the showing required by Rule 26(b)(3).
24 The "avoidance of time and effort" suffices. *Id.*; *see also Herbert v. Lando*, 441 U.S. 153, 177
25 (1979) (noting that "discovery provisions, like all of the Federal Rules of Civil Procedure are subject
26 to the injunction of Rule 1 that they be construed to secure the just, *speedy*, and, *inexpensive*
27 determination of every action") (emphasis in original and internal quotation marks omitted);
28

*Computer Assocs.*, 2003 WL 22159022, at *1 (noting that disclosure will expedite the litigation process).

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the identities of the five confidential witnesses (CWs) in the context of the motion at bar are not protected by the work product privilege. Even if the identities were protected by the work product privilege, the balancing of interests would strongly favor Defendants since the *de minimis* content of the witnesses' identities is outweighed by Defendants' interest in the information and value of expediting the litigation. Accordingly, the Court grants the Defendants' motion to compel answers to the interrogatories regarding the confidential witnesses.

This order disposes of Docket No. 237.

IT IS SO ORDERED.

Dated: September 13, 2007

_____
EDWARD M. CHEN
United States Magistrate Judge